20-1285 from the District of North Dakota, United States v. Willie Navarette. And Mr. McCabe is up, but I don't have him on my screen. Oh, there he is. He appeared. All right, Mr. McCabe, you're up to bat. May it please the court and Mr. Hagler, thank you for this opportunity. The issue of the stop, the first initial issue, I did notice that I wrote something in my brief on page nine that he was a convicted felon. And I must have, out of confusion, put that on there from the judge's opinion, which he wrote on these issues. And not in the finding of facts, but in the legal argument, the judge on page nine wrote he was Navarette. Sergeant Rivaska was aware that Navarette was a convicted felon. As I look at the transcript now, there really wasn't any evidence that he was a convicted felon. There was evidence that he was on federal supervision and he was convicted of a federal gun offense. But, you know, whether or not the officer knew he was a convicted felon, I think that's subject to question. So I think the two critical issues probably during that 21 minutes of detention is whether or not the officer knew that there was any evidence of a crime being committed in front of him. And I guess I would argue that without more sufficient information, I think that's the problem. Is at best, the officer knew that Mr. Navarette was on federal supervision, but for what? A misdemeanor? And what about the fact that he didn't have a driver's license, no proof of insurance, and just could only give his name and date of birth? Wasn't that the sort of lack of information that would require some follow up on the part of the officer? And Judge Kelly, thank you for asking that. The Rodriguez case sort of gives us the beginning and then of course we've got numerous cases after that about that issue. And I would certainly concede that is grounds for further detention to figure things out. But I think you combine that with the North Dakota offense being just a minor little traffic offense, which often could be just issued a warning or at best a little tiny citation. So at what point do you think that the purpose or goals of the stop had been concluded? I'm assuming you mean your argument is something before 21 minutes. At what point? Walk us through to the point where you think, nope, it needed to end that then. Well, as the officer attempted to find an identity, could not find an identity, once again asked for an identity. At some point on a small little ticket, the officer just can issue the ticket either with a warning or they can just simply issue the ticket. I mean, they can take the individual's name down and information. So to hold them there for 20 minutes, 21 minutes. Counselor, wait a minute. If he doesn't have a driver's license, he can't drive the car away. Why? So making a second request and letting him get out of the car to look for what he's struggling to find strikes me as a fully appropriate progression of an uncompleted traffic stop. He can't just give an unlicensed driver a ticket and let him drive away. Judge Loken, I would respectfully disagree. I think if it was determined that he was under suspension and could not drive, he could not drive away. But I think failure to have a driver's license would be addressed by a citation. I thought they looked and they couldn't find whether he was on suspension or anything, because all he could give was his name and the name didn't check out. And I would agree with you, Judge Loken, but it's about what does the officer know to support the seizure? And it's a lack of information in this case. Isn't it what was in plain view when he got out of the car? To check his pockets more thoroughly, right? Yes, but again, we don't know if a crime has been committed there because all we know is that he's on federal supervision, but he could be on federal supervision for a misdemeanor. Counselor? Yes? Judge Kelly's question is most interesting to me. And of course, immediately it's the no driver's license sort of supervision. But at how many minutes does the sergeant here, does she see the loaded gun magazine in the door panel? Do you know what time sequence that's at in your 21 minutes? You know, I went directly off the findings of fact from the judge and then a bit of the transcript, but I do not know the time element there. It's got to be pretty quick though, right? Because it's opening the door that she sees it, correct? Yeah, now I'm confused. Go ahead. You know, I can look that up for my rebuttal. I just can't remember. But again, it's just as equal that it could have been a misdemeanor at that point as a felony. That issue of him being a convicted felon is wrong. Nobody knew that he was a convicted felon. True, I get that. I get that. Well, that's got to be pretty quick. And you know, we have many cases where it's kind of one thing after another thing. And of course here, the next thing is the holster and then the handgun. At what point do you believe it stopped or the sequence was interrupted? That's Kelly's question. It's all I'm reformulating in a poor way. Thank you. You know, I can only say holding somebody for 20 minutes, in my view, just seems to be an awful long time for a simple citation. For not, you know, in this case, nothing else was proven for holding the individual other than, you know, what suspicion we have. But how long can you hold somebody on suspicion? That's really the question. I'm not denying that there was suspicion, but how long can you keep them there on that suspicion? But then, and I do think this is my better argument on this seizure issue, is handcuffing the individual. I think now we go into a different element where it's a de facto arrest. And I would argue at that point, that is well beyond just a suspicion case. Now we've gone into the de facto argument, and yet we still don't know a crime's been committed. At what point did that happen? At what point was he arrested? Well, he wasn't arrested. No, I'm sorry. Handcuffed. I said the wrong word. I'm sorry. At 21 minutes. At 21 minutes, he was handcuffed. The handcuffs are at 21. Yeah, so that's where I argue that we do not have probable cause at that point. We may well have suspicion, but not probable cause. Well, now wait a minute. You don't need probable cause to cuff someone during a Terry stop, depending upon the circumstances. I would agree, Judge Loken, and thank you for mentioning that. I mean, obviously this court has many cases on the de facto arrest issue. And I guess I would argue under these circumstances and how it was handled, that it rose to that level, where it was a de facto arrest. So, if I could move on then to the issue of using the suppression hearing testimony against the defendant during trial. You know, we'd start with the Simmons case, which is the major case. And I'll be the first to concede, no objection by trial counsel during trial on this issue. In Hardison, the case from this court that's cited in both briefs, it indicates I'm under a plain error standard, which I understand is quite difficult. But nonetheless, I believe I've met that threshold. And the reason is that, you know, Simmons, the United States Supreme Court, as this court's probably well aware, has avoided the issue thus far as to telling us whether or not evidence from the defendant's suppression testimony can be used to impeach the defendant during trial. In the Simmons case, it says it can't be used to establish guilt. Well, and I understand and I'm ready to concede that numerous appellate courts, as pointed out in the briefing, have found that they've distinguished Simmons and said that you can use testimony from a defendant's suppression hearing when they testify to impeach them if they testify in trial. This court has not ruled on that issue to my knowledge, but I would argue if you just look at the principles of Simmons, the principles of Simmons are to not deter somebody from exercising their Fourth Amendment rights. When they're contrasted with their Fifth Amendment rights. I think the synopsis of the appellate courts on this issue is that we don't want to encourage people to, you know, commit perjury either. So that's why we are allowing this testimony in to impeach them. If we were to find this on plain error, however, we would have to say that all of those other courts have just gotten it wrong. Isn't that kind of one of your biggest hurdles here that even if you could make the argument that it's error, whether it would be plain is kind of a difficult hill to climb, isn't it? Oh, I understand I'm on a difficult hill. But I mean, if we go with the original concept of Simmons, I mean, I'd like to argue that these other courts have gone in a different direction, which I think is contrasting Simmons. Simmons was trying to protect the individuals on their exercising their Fourth Amendment rights. And it seems that these court of appeals that have gone in a different direction are undermining the Fourth Amendment rights of the individual. So your argument for plainness is just basically the original Supreme Court case on the issue itself. Yes, Your Honor. And I do admit my better issue even on this particular issue is the original Simmons holding was, does it go to the guilt? And I think in this case, very clearly, the testimony that was used by the U.S. government went to guilt. There were two very important issues that the United States was able to establish by using this testimony. Because the biggest issue is they were allowed to establish that Mr. Navarrete inspected the vehicle, thereby showing that he would have known the firearms were in the vehicle. I do see my time is running low, so if I could wait, if I could use the rest of my time for rebuttal. Very good. Mr. Hagler. Thank you, Your Honor. I am David Hagler. I am an assistant U.S. attorney here in the Bismarck office representing the District of North Dakota, United States of America in this matter today. Your Honor, responding first to a couple of Mr. McCabe's comments regarding the fact that he says this was just a minor traffic violation. And that is indeed true at the outset that the officer stopped Mr. Navarrete for having a headlight out. However, under North Dakota law, it is a criminal violation to operate a vehicle without insurance. And as Your Honor has pointed out, it's also a criminal violation to drive under suspension. And when the officer initially only could get Mr. Navarrete's name, she appropriately went back to her vehicle, tried to get a records check on him. And there was no driving record that could be obtained. So as the court has pointed out, it was appropriate for her at that point to attempt to gather some additional identifying information. So she went back to Mr. Navarrete's vehicle. And at that point, as is set forth in the briefs and the factual basis and the district court's findings, Mr. Navarrete was checking his pockets, but he was still seated in the car. She asked him to step out. He did so, and she immediately saw the loaded magazine having knowledge that Mr. Navarrete was, again, on federal supervision. And counsel, the district court's very clear. She could tell it was loaded from a distance, huh? Yes, Your Honor. Okay. Proceed. Proceed with the finding. Proceed. Thank you. On the timing of those, as inquired by Your Honor, Judge Benton, the district court made some very specific findings that she ran the record check at 2.04. So that's about seven minutes in now, when Sergeant Rivasco would still have been in her vehicle trying to gather this information. And, of course, that took a few minutes to come back and get nothing, frankly. She then returned, and he was ultimately detained at 2.18. So between 2.04 and 2.18, she returns to his vehicle. He steps out. She sees the loaded magazine. So it's just that very few minutes, in addition, Your Honor, that it takes for her to see that. Another red flag going up, having now with an individual who can't identify himself, who is on federal supervision, who is driving around with a loaded gun magazine within arm's reach. She then, again, minutes later, pats him down under an appropriate terry pat-down and finds an empty gun holster. So now we've graduated to even a higher level there, Your Honor, where, in my opinion, she now has very clearly reasonable suspicion that criminal activity is afoot. It's very reasonable for her to conclude where there is a handgun holster empty on a person, there is, within a very short vicinity, a gun. In the record, it's also indicated he then, when she asks him, where's the gun, he moves back toward the vehicle. So now we've got officer safety concerns, which leads to the detention and the handcuffing. And, again, we cite in our brief Eighth Circuit authority for the fact that it is appropriate for an officer to handcuff an individual to detain them during a terry stop. So at this point, she's got this litany of reasons why she needs to investigate further to determine not only whether this man has a valid license to drive away, as Your Honor has pointed out, but whether or not he is indeed in the illegal possession of ammunition and or a handgun. So we think the record is very clear on that issue, and this was an appropriate stop, appropriate detention. We've graduated quickly to a very serious potential criminal offense here. Counsel, let me ask you quickly. In your view, does it matter for suppression purposes whether it was a de facto arrest? I don't think it does under these facts, Your Honor, because I think at the point that she did detain him, I believe she had probable cause to believe that he was in illegal possession of either ammunition and or a handgun. So I don't think under these facts that really is significant, Your Honor. And just one final point on kind of that first issue is that counsel says, well, gee, it may have only been a misdemeanor and therefore the officer didn't have a basis upon which to investigate further. Well, that gives her all the more reason to determine. She doesn't know at that point. She's got, frankly, an obligation to determine exactly what the circumstances are. So if there are no other questions on that first issue, I'll move on to the second issue. And that is the use of the hearing testimony, the suppression hearing testimony. So as the record clearly reflects, Your Honor, Mr. Navarrete testified at suppression hearings and the issue there was the traffic stop, whether it was a legal traffic stop and in particular the issue of the headlight being out. He testified at the suppression hearing that he had purchased the vehicle two days earlier, had thoroughly inspected it, and the night in question when he stopped, he had actually walked past the front of the vehicle. The headlight was on, so he was questioning the veracity of the officer on the issue of the headlight. Well, the court denied the motion and we proceed to trial. The United States did not introduce any of his suppression hearing testimony during case in chief. Defendant, in his case, took the stand, waiving his Fifth Amendment right at that point, and testifies in stark contrast to his testimony at the suppression hearing. In particular, he testifies at the trial now that he had not purchased the car, that he was test driving the car. He had been in the car for approximately 10 minutes before the officer pulled him over, that he didn't know the contents of the vehicle. The facts show that the handgun was found between the center console and the driver's seat. And then there were two long guns that were secreted in the backseat, but the handgun itself was in plain view in the front. Well, it wasn't in complete plain view because it took the second officer to find it, right? Got my facts right? Yes, Your Honor. It was. Okay, proceed. But when you said plain view, plain view to me means real plain view. Proceed. Okay. Did you mean in plain view of the driver? Yes, Your Honor. As opposed to an officer standing outside the vehicle. Sorry. No, that's what I was interpreting. Yes. And then from a legal standpoint, I would argue it was also in plain view of the officer who had with outside the vehicle with the aid of a flashlight because it was 2 a.m. He shines the flashlight inside and he sees the handgun. So I think it was in plain view of both, frankly, Your Honors. So again, we have to start contrast in testimony. So during cross-examination, I pointed out the disparities in the testimony between his earlier testimony at the suppression hearing and his trial testimony. And then during closing argument, I couched this specifically in terms of, you know, two of the jury instructions, probably the most important one being the credibility of witnesses. And what I explained to the jury was, you are the finders of fact, you determine the credibility of witnesses, and you heard testimony that he had the vehicle for two days versus he had the vehicle for 10 minutes. You can consider prior statements made by a witness, including a defendant, set forth in the jury instruction. So I indeed did point out the specifics of his testimony at the suppression hearing, but only to compare it to the disparity between his testimony at the trial. Would you agree, Counsel, that it is a fine line, and I appreciate what you're saying, and the instruction is that it's for impeachment and credibility. But it's really hard for a jury not to take that prior testimony as substance. Like, oh, that's what he really is saying. It's a hard one. It's a fine line. I don't disagree, Judge Kelly. You know, the one thing I want to point out with Simmons, though, is what Simmons says is that evidence from a prior hearing, such as a suppression hearing, can't be used if it's objected to. So in this case, there was never any objection to any of this. So under the plain rule of Simmons, the testimony at the suppression hearing could have been used during our case in chief. You know, I find that I think that's sort of interesting, this objection. I think that that's sort of developed in your argument that, well, if there's the language of it may not be thereafter admitted against him at trial on the issue of guilt unless he makes no objection. In other words, that's the end of the analysis. It doesn't really go into a waiver, forfeiture kind of analysis. I think another reading of that could be unless he's like, OK, bring it in. That's fine. I'm OK with that kind of evidence coming in. So I understand your argument, but I wonder whether we're reading a little bit more into, you know, five words of a Supreme Court opinion than maybe we should be. Very good point, Judge Kelly. And I don't again, I don't disagree with that. What I'm saying here and in kind of part of what the plain error analysis here is that, again, there was no objection. So the court wasn't put in a position where they needed to make a ruling on that, for example. And again, just a little bit further on the plain error analysis that we were dealing with here, as your honors have pointed out during counsel's argument. There is no, I'm unaware of any case anywhere in the country where what happened here was a violation. So we simply can't get to plain error when every court that has addressed this particular issue has allowed this sort of testimony to be used for impeachment. Now, again, I realize we are also then talking about the issue of, well, did it go beyond impeachment? Was it used as substantive evidence of guilt? And I believe if you carefully review the entire closing argument, including the rebuttal, I continue to couch it under the terms of you need to consider all this testimony to determine the credibility of the witness. In this case, the defendant. I'm sorry, I've lost my clock. So does anyone know how to two minutes, two minutes, two minutes left? OK. I think that's really all I have, your honors, unless, of course, there are some additional questions. Very good. Thank you. How much time, Mr. McCabe? There it is. Three minutes for rebuttal. You're muted. Oh, I was just going to say, I've got a big clock on the top of my screen. But anyway, to get to that last issue, which I think is really, really fundamental for this case. And that is, as Mr. Hagler says, there are a number of cases, a number of circuit court cases, but I believe they all address the issue of impeachment. They're all about impeaching the witness, not about going to an element of the case that the government's establishing to get a conviction. And I see this case as very... You argued in your main argument that you were relying on Simmons, the original Simmons holding. Yes, sir. Of course, part of that holding was unless there is no objection. You can say that, and I think Judge Kelly was maybe getting at, the principle of PLE of Simmons may create questions as to what that unless there's no objection means. But you're not relying on the holding of Simmons as stated by the Supreme Court, it seems to me. Well, I'm relying upon Simmons and then I guess the extension of interpretation of Simmons from this court in Hardison, which said that I'm under a plain error view. So that I think that's where I see myself as under plain error for the lack of an objection. So at least under Simmons and from this court, Hardison, it seems that we have a real problem here when the government is using evidence from the suppression hearing to establish an element of the offense, to actually establish guilt. And we can talk all day long about that jury instruction that Mr. Hagler talked about. But at the end of the day, the final thing the jury was told was that rebuttal test or statements from him. And I cited in my brief, Mr. Hagler cites it in his brief. And it's very clear that he told the jury that in considering the intent to control exercise, you can consider that testimony. So I'm sorry, but that goes against the jury instruction that he's just told him to look at. And I very much agree with Judge Kelly, how she said it's a fine line. But I think that line was crossed when Mr. Hagler, and I very much appreciate Mr. Hagler, he's a great attorney. But that crossed the line when you tell in rebuttal, the final word to the jury that, hey, just use the suppression testimony to find that he knew that the firearms were in the vehicle. I mean, that's the last thing they heard. And I think that goes against Simmons. I think it goes against the plain error review that was set forth by Hardison, by this court. And just, if it isn't clear to the court, I think, you know, he hired a new attorney at the last minute. It's very painfully clear the attorney did not know about the suppression hearing transcript and he was caught flat footed during trial. And for whatever it could be viewed as structural error for what happened there, I would ask this court to review that as well, as I say in my final paragraph. Thank you so much, your honors. Very good, counsel. The case was effectively briefed and argued. Mr. McCabe, the court appreciates your service under the Criminal Justice Act and we will take it under advisement.